**E-FILED**
Friday, 08 March, 2013  02:02:07 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| VINCENT EHRICH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-cv-3053 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Vincent Ehrich appeals from the denial of his application for Social Security Disability Insurance Benefits ("Disability Benefits") under Title II of the Social Security Act.  42 U.S.C. §§ 416(i), 423.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g).  Ehrich has filed a Motion for Summary Judgment (d/e 10), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e12).  The matter is before the Court for a Report and Recommendation.  Text Order entered October 22, 2012.  For the reasons set forth below, this Court recommends that the decision of the Commissioner should be affirmed.

<u>STATEMENT OF FACTS</u>

Ehrich was born on January 7, 1965.  He secured a GED in 2000.

<u>Answer to Complaint (d/e 8)</u>, attached <u>Certified Copy of Transcript of</u>

<u>Record of Proceedings (R.)</u>, at 25, 130-37, 185.  On or about August 21,

1998, Ehrich was severely injured in a coal mining accident.  He suffered a

right distal radius fracture, pelvic fracture, sacral fractures with right lower

extremity paresis, a left wrist fracture, and fractures of the fourth through

the eleventh left ribs.  Dr. Tomasz Borowiecki, M.D., performed several

surgeries on Ehrich in 1998 to correct the damage as much as possible.

R. 20, 274-89, 301-12.

On January 7, 1999, Ehrich saw Dr. Borowiecki for a follow up visit.

Ehrich's mother reported that Ehrich spent most of his time sitting on the

couch.  Ehrich complained of pain when he sat down.   R. 293.

Ehrich saw Dr. Borowiecki again on April 1, 1999.   X-rays were taken

at that time.  Dr. Borowiecki's impression after examination of Ehrich and

review of the X-rays was status/post-severe crushing injury with pelvis

fractures, avulsion of the gluteal on the right side, sciatic nerve injury with

no evidence of neurological recovery, and a left wrist fracture that was

asymptomatic.  R. 292.

On June 3, 1999, Ehrich saw Dr. Borowiecki.  By then Ehrich was driving and was walking without a cane with a swinging gait. Dr. Borowiecki said, "I think it is amazing how functional he has become in spite of the deficits that he has."   R. 291.  Ehrich's sciatic nerve function had not changed.  His hamstrings were extremely weak with just a twitch of contraction.  He had no motor function distal to the leg.  He had spotty sensation.  Dr. Borowiecki noted, "He is really not having any pain complaints per se."  R. 291.  Dr. Borowiecki noted that Ehrich was determined to function independently.  R. 291.

On September 9, 1999, Ehrich saw Dr. Borowiecki.  Ehrich walked with a limp and had a persistent foot drop, and rhabomyolysis.  Ehrich indicated that he wanted to return to work.  Dr. Borowiecki recommended an occupational medicine evaluation and work capacity evaluation. Dr. Borowiecki stated that Ehrich was near his maximum medical improvement from his injury and the deficits he had with nerve function were permanent.  R. 290.

Ehrich went back to work in 2001.  R. 189.  He worked as a brick laborer, a certified nursing assistant, and a forklift driver.  R. 181.  He also had some jobs at gas stations, but the amount of work at those jobs was not enough to constitute substantial gainful activity.  R. 164.  He stopped

working on March 7, 2007.  R. 34.  He applied for Disability Benefits on September 11, 2008.

On October 29, 2008, Ehrich saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination.  On examination, Ehrich could bear weight and ambulate without ambulatory aids.  Ehrich walked with a limp due to right foot drop.  He was unable to walk on his toes or heels and was unable to perform tandem walking.  Dr. Chapa noted atrophy of the right calf and right thigh, both measured 5 cm. less than the right side.  Motor strength of the dorsiflexors and plantar flexors of the right ankle was 0/5.  The motor strength of the proximal right lower extremity was 5/5.  Right ankle reflex was absent.  The right knee reflex was 1+ and left knee reflex was 2+.  Ehrich had no active range of motion of the right ankle, but full range of motion in all other joints.  Straight leg raising test was negative bilaterally.  Ehrich had pinprick sensation loss in his right foot.  Ehrich had normal handgrip, symmetric upper extremity reflexes, and could use his hands to perform fine and gross manipulations.  R. 248-49.

On November 17, 2008, agency physician Dr. Towfig Arjmand, M.D., reviewed the medical records and prepared a residual functional capacity assessment.  Dr. Arjmand opined that Ehrich could lift twenty pounds occasionally and ten pounds frequently; could stand and/or walk for six

hours in an eight-hour workday; could sit for six hours in an eight-hour workday; and Ehrich was limited in his ability to push and pull with his right side.  Dr. Arjmand referred to Dr. Chapa's examination in reaching forming these opinions.  Dr. Arjmand opined that Ehrich was limited to occasional climbing of ramp and stairs, and occasional balancing, stooping, kneeling crouching, and crawling.  He opined that Ehrich should never climb ropes or ladders.  R. 253.  Dr. Arjmand opined that Ehrich was partially credible and that the objective evidence did not support the alleged severity of Ehrich's complaints.  R. 258.

On July 15, 2010, Ehrich went to see Dr. Lydia Villafuerte, M.D. Ehrich complained of no feeling in his right leg, right foot drop, and loss of bowel or bladder control.  R. 1974.  On examination, Dr. Villafuerte observed an antalgic gait.  R. 1975.  Dr. Villafuerte noted, "I am at a loss why he can't get his disability.  However in this meeting I feel that his problems are all connected to his injury sustained.  I feel he has autonomic dysreflexia, which unfortunately is not reversible."  R. 1976.  Dr. Villafuerte prescribed hydrocodone (also referred to in the record as Vicodin) for the pain.  R. 1977.

Ehrich went to see Dr. Villafuerte again on July 29, 2010.

Dr. Villafuerte diagnosed Ehrich with an adjustment disorder with prolonged depressed mood.  Dr. Villafuerte told Ehrich that she reviewed his medical records and she believed that he was disabled and unable to hold a job. R., 1969.  Dr. Villafuerte opined that Ehrich's problems stemmed from his 1998 injuries in the mining accident.  R. 1969.  Dr. Villafuerte added Wellbutrin for depression to the hydrocodone for pain.  R. 1970.

On August 10, 2010, Dr. Villafuerte completed a Physical Residual Functional Capacity Questionnaire form.  R. 1957-61.  Dr. Villafuerte listed Ehrich's symptoms as foot drop, leg pain, back pain, depression, and fecal incontinence.  R. 1957.  Dr. Villafuerte opined that the pain was secondary to the 1998 injury.  Dr. Villafuerte opined that Ehrich constantly experienced pain that interfered with his attention and concentration.  R. 1958. Dr. Villafuerte opined that Ehrich was incapable of performing even low stress jobs.  Dr. Villafuerte opined that Ehrich could never lift less than ten pounds, could never perform work-related activities such as twisting, stooping, bending, crouching, squatting, climbing ladders, and climbing stairs.  R. 1959-60.  Dr. Villafuerte opined that Ehrich would need to take more than ten unscheduled breaks in a workday, with each break lasting

twenty minutes.  R. 1959.  Dr. Villafuerte opined that Ehrich would be absent from work more than four days each month.  R. 1960.

On August 18, 2010, the Administrative Law Judge (ALJ) conducted an evidentiary hearing by video teleconference.  R. 31-86.  Ehrich appeared with his attorney in Springfield, Illinois.  The ALJ presided in Peoria, Illinois.  Vocational expert James E. Lanier also appeared at the hearing in Peoria.  R. 33.

Ehrich testified first.  He testified that he completed his GED and had no other education or training.  R. 34.  He lived in a one-story house with his girlfriend.  R. 60-61.  He stopped working on March 7, 2007, because, "the simple things that I had to do was just not possible anymore.  And that was the third job at a gas station."  R. 34.

Ehrich testified that he was being treated by Dr. Villafuerte.  He testified that he saw her for the first time on July 15, 2010, and he saw her three times before the hearing.  R. 35.  Ehrich testified that he saw a Dr. Baron in 2008 for testosterone shots and a prostate examination.  He testified that he did not return to see Dr. Baron because he had not paid Dr. Baron's bill.  R. 37.  Ehrich testified that he had been trying to see a doctor for some time without any luck.  He testified that he tried unsuccessfully to get an appointment with a doctor for a year and a half

before seeing Dr. Villafuerte.  R. 43-44.  Ehrich had not gone to the emergency room during this period.  R. 44.

The ALJ asked Ehrich what was keeping him from returning to work. Ehrich testified that walking was very tiring.  He walked clumsily.  He also testified that he had nerve pain.  He testified that the nerve pain sometimes "absolutely kills me."  R. 40.  He testified that he experience "phantom pain" in parts of his body that he normally does not have feeling.  He testified that this pain "will leave me basically dead to the world for at least the next two days."  R. 40.  Ehrich testified that he had phantom pain in his foot about once a month.  R. 74.

Ehrich testified that the pain increased as he stood and moved around, "The more I move around, your honor, is the worse it would get, yes.  The more I stay on my feet when I shouldn't be, the more I have to walk – where I don't need to be walking – where I don't need to be walking – anything along that line."  R. 50.  Ehrich said nothing helped the pain except the hydrocodone.  R. 50.  Ehrich testified he had daily pain in his left arm.  Using the arm made the pain worse.  R. 51-52.  Ehrich testified that the hydrocodone did not relieve the pain in his arm.  R. 52.

Ehrich testified that he condition had gotten worse beginning in 2005 or 2006.  Ehrich testified that he "slowly seem[ed] to go downhill."  R. 41.

He began have more pain and discomfort.  He testified that he could not sleep.  He testified that he had to change positions, "I'm always either sitting, moving around, laying down, or any combination thereof."  R. 42. Ehrich testified that he legs had become weaker in the last few years due to nerve loss.  R. 68.  Dr. Villafuerte told him that the nerve and muscle loss would never change.  R. 70.

Ehrich testified that Dr. Villafuerte prescribed hydrocodone for pain and Wellbutrin for depression.  R. 42.  He testified that the hydrocodone helped "to a certain point."  R. 42.  The hydrocodone made him feel more comfortable.  R. 50.  He testified the hydrocodone allowed him to move around and not concentrate on what's hurting.  R. 53.  He testified that he tries to take as little of the hydrocodone as possible.  R. 42-43.  He testified that the hydrocodone made him tired and dizzy.  He testified that he only took over-the-counter pain medication before he saw Dr. Villafuerte.  R. 43.

Regarding his depression, Ehrich testified that he did not perceive "any significant improvement" from the Wellbutrin.  R. 44.  He testified that he had no side effects from the Wellbutrin.  R. 45.  Ehrich described his depression symptoms and sexual dysfunction; overeating; problems sleeping; problems with memory, focus, concentration; and problems completing tasks.  R. 45-49.

The ALJ asked Ehrich to describe what he did the day before the hearing.  Ehrich testified that he woke up between 7:00 and 8:00 a.m.  He then sat on the couch and drank coffee and watched television.  About 9:00 a.m., he took a shower.  He spent most of the day watching television, organizing his papers for the hearing, and playing with his dogs on his patio.  He also drove to the bank to deposit a check.  During the day, he ate some leftovers from the meal that his girlfriend prepared the night before. He made his own dinner that night.  R. 53-60.

Ehrich testified that, generally, he did some of the household cleaning.  He washed dishes, did laundry, and sometimes made the beds. His girlfriend did the vacuuming.  Ehrich drove regularly.  He sometimes drove twenty miles to Elkhart, Illinois, to see his mother.  R. 62-63.

Ehrich testified that good days and bad days.  He estimated he usually had four good days a week and three bad days a week.  R. 75. Some days he has to lie down the entire day due to the pain in his leg.  He estimated that he had such days three times a month.  R. 75-76.  He testified that he also gets tired easily.  He estimated that he would need to lie down and rest three to four times day in an eight-hour workday.  Each rest period would need to be thirty minutes long.  R. 80.

Ehrich testified that he could sit for about forty-five minutes to an hour, stand for fifteen to twenty minutes, walk a block, and lift ten to fifteen pounds.  R. 66.

Vocational expert Lanier also testified at the hearing.  The ALJ asked Lanier the following hypothetical question:

> So I'd like you to consider the following, Dr. Lanier:  The ability to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk six hours a day; sit six hours a day; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, crawl, but never climb ladders, ropes, or scaffolding and avoid concentrated exposure to hazards.  Which these limitations, would Mr. Ehrich be able to perform any past work?

R. 81.  Lanier said that such a person could not perform Ehrich's past relevant work.  Lanier testified that such a person could perform other jobs.  Lanier listed a representative sampling of the possible available jobs that such a person could perform:  mail clerk, 1,200 such jobs in Illinois and 32,000 nationally; routing clerk, 1,700 in Illinois, and 112,500 nationally; surveillance system monitor, 1,500 in Illinois and 19,500 nationally; document preparer, 1,300 in Illinois and 32,000 nationally; and collator, 3,600 in Illinois and 51,000 nationally.   R. 81-82, 84.  Lanier further opined that all of the representative jobs would have a sit/stand option for the person performing the job.  R. 82.

The ALJ asked Lanier to assume the person had additional limitations that limited him to simple jobs that could be learned within 30 da2ys and were limited to "a routine and repetitive work environment."  The ALJ added further limitations that there could be no "project paced work or rather goal-oriented work and no interaction with the general public."  Lanier opined that such a person could still perform all of the representative jobs he already identified, except, perhaps the mail clerk.  R. 83-84.

Lanier opined that a person could not work if he had to be off-task twenty percent of the time, or if he had to be off work two or more days a month.  R. 84.   The ALJ then concluded the hearing.

Ehrich saw Dr. Villafuerte on August 25, 2010.  Dr. Villafuerte increased the dosage of the Wellbutrin.   R. 1966-67.[1]

## THE DECISION OF THE ALJ

The ALJ issued her decision on October 29, 2010.  R. 18-26.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial

---

[1] Ehrich discusses medical evidence of examinations and treatment that occurred after the decision of the ALJ.  See Brief in Support of Plaintiff (d/e 11), at 9.  Ehrich does not seek a remand for further proceedings under 42 U.S.C. 405(g) sentence six.  Such evidence, therefore, is not relevant.  See Eads v. Secretary of Dept. of Health and Human Services, 983 F.2d 815, 817-18 (7th Cir. 1993).

gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R.

§§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that he is disabled regardless

of the claimant's age, education and work experience.  20 C.F.R.

§§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the

claimant's condition must meet the criteria in a Listing or be equal to the

criteria in a Listing.  20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not so severely impaired, then Step 4 requires the

claimant not to be able to return to his prior work considering his age,

education, work experience, and Residual Functional Capacity (RFC).

20 C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his

prior work, then Step 5 requires a determination of whether the claimant is

disabled considering his RFC, age, education, and past work experience.

20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  Briscoe ex

rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater,
55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Ehrich met his burden at Steps 1 and 2.  He had
not engaged in substantial gainful activity since March 7, 2007, and he
suffered from severe impairments of a history of a crush injury of the right
leg with residual effects including drop foot, history of a left arm fracture,
hearing loss, and depression.  R.20.

At Step 3, the ALJ found that Ehrich's conditions did not meet or
equal any Listing.  The ALJ considered Listings 1.02, 2.08, and 12.04 for
major dysfunction of joints, hearing loss, and depression.  R. 22.

At Step 4, the ALJ found:

> [T]he claimant has the residual functional capacity to perform
> light work . . . except requires a sit/stand option; no exposure to
> temperature extremes; no climbing of ladders, ropes or
> scaffolds; no work involving hazards such as dangerous
> machinery or unprotected heights; no walking over rough or
> uneven surfaces; limited to occasional climbing of ramps and
> stairs and occasional balancing, stooping, kneeling, crouching
> or crawling; limited to a routine and repetitive work environment
> with understanding, remembering and carrying out work
> instructions learned within 30 days; no production paced work,
> but rather goal oriented work with no work interaction with the
> general public.

R. 23.  The ALJ based her findings on Ehrich's daily activities; the fact that
Ehrich did not receive medical treatment from 1999 to 2010 even though
the alleged onset date was in 2007; and the opinions of Drs. Arjmand and

Chapa.  R. 23-25.  The ALJ found Ehrich's testimony about the severity of his symptoms was not credible.  The ALJ also discounted Dr. Villafuerte's diagnoses and opinions because Dr. Villafuerte had only seen Ehrich a three times in the month before the hearing, her assessment of Ehrich's functional limitations was inconsistent with Ehrich's own testimony, and her diagnosis of autonomic dysreflexia was not supported by any objective medical evidence.  R. 23-24.  Based on Ehrich's RFC and Lanier's testimony, the ALJ found at Step 4 that Ehrich could not perform his past relevant work.  R. 25.

At Step 5, the ALJ found that Ehrich could perform a significant number of jobs that exist in the national economy.  R. 25.  The ALJ relied on the RFC, the Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, and Lanier's testimony.  R. 5-26.  The ALJ, thus, concluded that Ehrich was not disabled.

Ehrich appealed.  December 19, 2011, the Appeals Council denied his request to review the ALJ's decision.  R. 1.  The ALJ's decision then became the decision of the Commissioner.  R. 1.  Ehrich then filed this action for judicial review.

ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment. Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record. Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).[2] The ALJ must articulate at least minimally his analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ's decision is supported by substantial evidence. The findings at Steps 1 and 2 are supported by the record. The finding at Step 3 that Ehrich did not meet a Listing is also supported by substantial evidence. The Listing for deformity of a weight bearing joint such as Ehrich's ankle, for example, requires and inability to ambulate. Listing

---

[2] Ehrich does not challenge the ALJ's credibility findings regarding Ehrich's testimony.

1.02A.  An inability to ambulate is only met if the person needs a walker or two assistive devices to ambulate or cannot walk a block over rough or uneven surfaces.  Listing 1.00B2b.  Ehrich walked without any assistive devices and testified that he could walk a block without stopping.  The Listings for hearing loss and depression also require medical evidence of functional impairments that do not exist in the record.  See Listing 2.08 and 12.04.  The ALJ's finding that Ehrich failed to meet his burden at Step 3 is, thus, supported by substantial evidence.

The ALJ's RFC finding is supported by the opinions of Drs. Chapa and Arjmand, and the RFC finding and the testimony of Lanier supports the ALJ's decision at Step 4 that Ehrich could not perform his past relevant work.  Finally, the ALJ's findings at Step 5 are supported by Lanier's testimony and the Medical Vocational Guidelines.  The decision, therefore, is supported by substantial evidence.

Ehrich argues that the ALJ erred in not finding that Ehrich met the Listing for disorders of the spine, Listing 1.04.  Listing 1.04 states, in part:

> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine,

motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Listing 1.04.  The basic requirement for this Listing is evidence of damage to the spine that results in compression of the nerve root or spinal cord. Ehrich presents no medical evidence of any of these conditions.  Ehrich suffered damage to the sciatic nerve and resulting nerve damage in his leg, but the medical evidence does not show damage to the spinal cord or nerve root compression.

Furthermore, Ehrich does not meet the requirements of paragraphs A, B, or C, and Ehrich does not meet any of them.  Paragraph A requires positive straight leg testing when, as here, the lower back is involved.[3] Dr. Chapa found straight leg raising tests to be negative bilaterally.  Thus, paragraph A is not demonstrated.  Paragraph B requires an operative note or pathology report to confirm.  Ehrich does not cite to any such documentation in the record.  Paragraph C requires an inability to ambulate effectively.  Again, Ehrich can walk without any assistive devices and testified that he could walk a block.  The ALJ's decision not to consider Listing 1.04 was supported by substantial evidence.  There was no error.

Ehrich next argues that the ALJ erred in not stating reasons for discounting the opinions of Drs. Villafuerte and Chapa.  The Court disagrees.  First, the ALJ's decision is consistent with Dr. Chapa's report. Dr. Arjmand reviewed Dr. Chapa's report and relied on it in opining on Ehrich's residual functional capacity.  The ALJ's followed Dr. Arjmand's opinions, and so, considered Dr. Chapa's findings.

The ALJ rejected Dr. Villafuerte's opinions.  A treating physician's opinions regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not

---

[3] Any possible damage to Ehrich's spine from the 1998 accident came in the lower back, in the sacral area.

inconsistent with other substantial evidence in the record.  20 C.F.R. §

404.1527(d)(2).  The ALJ rejected Dr. Villafuerte's opinions because they

were not supported by medical findings in the record.  The ALJ determined

that Dr. Villafuerte's diagnosis of autonomic dysreflexia was not supported

by any objective medical findings.  R. 24.  The Court agrees.  Autonomic

dysreflexia is caused by a spinal cord injury above thoracic (chest) level 5

or 6 (T-5 or T-6) of the spine.  See e.g., Consortium for Spinal Cord

Medicine, Autonomic Dysreflexia: What You Should Know, at 1 (1997),

available at http://www.scicpg.org/cpg_cons_pdf/ADC.pdf, viewed March 7,

2013; National Spinal Cord Injury Association, Resource Center, "6.1 What

is autonomic dysreflexia," available at http://www.spinalcord.org/resource-

center/askus/index.php?pg=kb.page&id=1394, viewed March 7, 2013.

None of the medical evidence shows an injury to Ehrich's thoracic spine;

the mining accident crushed Ehrich's hips, legs and sacral area, not his

chest.  The ALJ, therefore, did not err is rejecting this diagnosis because it

was not well supported by medical findings.  The ALJ also did not err in

holding that Dr. Villafuerte's opinions on functional limitations were not

supported by medical findings.  Dr. Villafuerte's opinions were inconsistent

with Dr. Arjmand's opinions and with Ehrich's own testimony.  The ALJ did

not err in deciding not to give weight to Dr. Villafuerte's opinions.

WHEREFORE this Court recommends that Defendant Commissioner's Motion for Summary Affirmance (d/e12) should be ALLOWED, Plaintiff's Motion for Summary Judgment (d/e 10) should be DENIED, and the decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:  March 8, 2013

_____
s/ Byron G. Cudmore
UNITED STATES MAGISTRATE JUDGE